**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| JAMES EDWARD SCOTT, III,<br><br>                                    Plaintiff,<br><br>        v.<br><br>GAYLENE FUKAGAWA, *et al.*,<br><br>                                    Defendants. | Case No. 3:23-CV-00254-MMD-CLB<br><br>**REPORT AND RECOMMENDATION<br>OF U.S. MAGISTRATE JUDGE[1]**<br><br>[ECF No. 43] |

This case involves a civil rights action filed by Plaintiff James Edward Scott, III ("Scott") against Defendants Gaylene Fukagawa ("Fukagawa"), Melissa Mitchell ("Mitchell"), Kathy Morales ("Morales"), Krystal Waters ("Waters"), John Weston ("Weston"), Cynthia Purkey ("Purkey"), Vanessa Timbreza ("Timbreza"), and Kellen Prost ("Prost") (collectively referred to as "Defendants"). Currently pending before the Court is Defendants' motion for summary judgment. (ECF No. 43, 45, 47.)[2] On March 6, 2025, the Court gave Scott notice of Defendants' motion pursuant to the requirements of *Klingele v. Eikenberry,* 849 F.2d 409 (9th Cir. 1988), and *Rand v. Rowland,* 154 F.3d 952 (9th Cir. 1998). (ECF No. 48.) Scott did not timely file his response, thus the Court *sua sponte* granted Scott an extension of time to file his response. (ECF No. 50.) To date, Scott has failed to file an opposition to the motion. For the reasons stated below, the Court recommends that Defendants' motion for summary judgment, (ECF No. 43), be granted.

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Scott is formerly an inmate incarcerated in the Nevada Department of Corrections ("NDOC") and housed at the Northern Nevada Correctional Center ("NNCC"). On June 7, 2023, Scott submitted a civil rights complaint under 42 U.S.C. § 1983 for events that

---

[1]      This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

[2]      ECF No. 45 consists of Scott's medical records filed under seal. ECF No. 47 is an erratum to the motion for summary judgment, which contains an authenticating declaration.

1    occurred while Scott was incarcerated at NNCC. (ECF No. 1.) The claims underlying this

2    lawsuit relate to Scott's allegation that he was diagnosed with end-stage kidney disease

3    on May 16, 2019. (ECF No. 5 at 4). In this complaint, Scott alleged the following. To treat

4    his end-stage kidney disease, Scott receives dialysis through a perma-catheter three

5    times each week during sessions that last 4 hours and 15 minutes. (*Id.*) All nursing staff

6    at Northern Nevada Correctional ("NNCC") were aware that Scott faces a high risk of

7    infection through his perma-catheter. (*Id.*) Scott's perma-catheter site must be kept clean

8    and dry using sterile dressings. (*Id.*) For most of 2019, nursing staff at NNCC changed

9    the dressings on Scott's perma-catheter site whenever staff who performed Scott's

10   dialysis treatment could not. (*Id.*) Scott did not sustain an infection when nursing staff

11   replaced his dressings. (*Id.*)

12          Scott alleges that in 2020 NNCC's nursing staff stopped changing Scott's

13   dressings stating, "since you like to file grievances, here's the supplies do it yourself." (*Id.*

14   at 5). Sometimes nursing staff provided Scott with the gauze, antibacterial soap, and

15   Tegaderm adhesive necessary to change his own dressings but did not instruct him how

16   to perform the procedure. (*Id.*) Although nursing staff observed that Scott's perma-

17   catheter site was often too wet or exposed, they refused to replace his dressings. (*Id.* at

18   6). Scott alleges that from 2020 to 2022, Scott repeatedly sought to have nursing staff

19   change his dressings but was only given the supplies along with statements to the effect

20   that Scott could perform the procedure himself because he files so many grievances. (*Id.*)

21          Scott alleges he was forced to change the dressings himself in his cell, which was

22   not sterile. (*Id.*) As a result, Scott repeatedly contracted a staphylococcus bacterial

23   infection of his blood and was hospitalized over five times to treat it. (*Id.*) The bacterial

24   infection caused Scott to suffer "severely intense headaches, optical migraines,

25   ceaseless chills, profuscious [sic] vomiting, sore and aching muscles and joints, and

26   fevers as high as 103.8." (*Id.* at 6–7). Scott alleges that sometimes care for his infection

27   was delayed by 21 days. (*Id.* at 7). Sometimes medical staff allowed Scott to receive his

28   dialysis treatment while he had an untreated bacterial infection, causing his infection to

1   worsen. (*Id.*) Although Scott repeatedly suffered bacterial infections because his perma-

2   catheter dressings were not applied or kept sterile, nursing staff refused to replace Scott's

3   dressings. (*Id.*)

4        According to a declaration submitted by Kristen McGee, the Facility Manager for

5   NaphCare at NNCC, dialysis care at NNCC is provided through an outside contractor,

6   NaphCare. (ECF No. 43-1 at 2-3.) The industry standard for dialysis care is that only

7   dialysis nurses, or medical staff specifically trained on how to change dialysis dressings,

8   are supposed to change the dressings for dialysis patients. (*Id.*) Dialysis patients are

9   instructed to not change or adjust their own dressings, but to notify staff if they need their

10  dressings changed. (*Id.*) The patient would then be transported to have dialysis staff

11  change the dressings. (*Id.*) Dialysis dressings would be routinely changed at the

12  beginning of a patient's scheduled dialysis procedure. (*Id.*) This allowed the dialysis

13  provider to inspect the dialysis port for functionality and infection. (*Id.*) Dialysis staff would

14  then change the dressing and the patient could start their dialysis. (*Id.*)

15       Despite these instructions, Scott would occasionally present for his dialysis

16  treatment with a different dressing, or a dressing which had obviously been tampered

17  with. (*Id.* at 4.) When asked by dialysis staff why the dressing was different or tampered

18  with, Scott would refuse to tell them. (*Id.*)

19       According to the authenticated evidence submitted by Defendants, Scott was

20  transported to Carson Tahoe Hospital ("CTH") approximately twelve times from 2020 to

21  2022, including three overnight hospitalizations. (ECF No. 45-1.) Many of the visits related

22  to Scott's fistula in his right upper extremity and subsequent thrombectomy of the fistula.

23  (*See id.*) Of these visits, two related to possible infections. First, on July 20, 2022, Scott

24  was transported to CTH with a suspected infection and complaints of aches, malaise, and

25  an overall feeling of unwellness. (*Id.* at 107.) It was determined Scott did not have an

26  infection at that time. (*Id.* at 128.)

27       On August 8, 2022, a blood culture was taken and returned positive for bacteria.

28  (*Id.* at 198-199.) On August 9, 2022, Scott was transported to CTH, where it was

1  determined he had "symptomatic line-associated bacteremia," which turned out to be

2  Enterobacter. (*Id.* at 133-134, 156, 183-184.) Consultation notes from August 10, 2022

3  and August 12, 2022, state that Scott has had "multiple rounds on (sic) infections and

4  claims its (sic) due to unsanitary conditions at prison and not being given enough supplies

5  to protect the cathter (sic) from sweat/shower." (*Id.* at 145, 172.) To treat the infection,

6  Scott's tunneled hemodialysis catheter was removed. (*Id.* at 160.) A discharge note also

7  indicated that Scott "expressed concern over frequent infections due to inability to keep

8  port area clean." (*Id.* at 175.)  Scott was ultimately discharged from CTH on August 12,

9  2022. (*Id.*)

10  On January 11, 2024, the District Court entered a screening order on Scott's

11  complaint, allowing Scott to proceed on a First Amendment retaliation claim against

12  Defendants and an Eighth Amendment deliberate indifference to serious medical needs

13  claim against Defendants. (ECF No. 5.)[3] Additionally, the District Court dismissed, with

14  prejudice, claims under the Americans with Disabilities Act and Rehabilitation Act about

15  NNCC's nursing staff refusing to replace Scott's dressings and delaying treating his

16  bacterial infections. (*Id.*)

17  On March 5, 2025, Defendants filed the instant motion arguing summary judgment

18  should be granted because: (1) Scott failed to exhaust his administrative remedies as to

19  the First Amendment claim; and (2) Defendants are entitled to qualified immunity as Scott

20  cannot establish that any violation occurred and there is no clearly established case that

21  would put Defendants on notice their conduct violated Scott's rights. (ECF No. 43.)

22  **II.    LEGAL STANDARDS**

23  "The court shall grant summary judgment if the movant shows that there is no

24  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

25  of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The

26  _____

27  [3]    The screening order also allowed these claims to proceed against Defendants
"Sharon", "Meghan", and "Mallory". However, service was not perfected as to these
Defendants pursuant to Federal Rule of Civil Procedure 4(m) and therefore the Court
28  recommends dismissal without prejudice.

1    substantive law applicable to the claim determines which facts are material. *Coles v.*

2    *Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242,

3    248 (1986)). Only disputes over facts that address the main legal question of the suit can

4    preclude summary judgment, and factual disputes that are irrelevant are not material.

5    *Frlekin v. Apple, Inc.*, 979 F.3d 639, 644 (9th Cir. 2020). A dispute is "genuine" only where

6    a reasonable jury could find for the nonmoving party. *Anderson*, 477 U.S. at 248.

7         The parties subject to a motion for summary judgment must: (1) cite facts from the

8    record, including but not limited to depositions, documents, and declarations, and then

9    (2) "show[] that the materials cited do not establish the absence or presence of a genuine

10   dispute, or that an adverse party cannot produce admissible evidence to support the fact."

11   Fed. R. Civ. P. 56(c)(1). Documents submitted during summary judgment must be

12   authenticated, and if only personal knowledge authenticates a document (i.e., even a

13   review of the contents of the document would not prove that it is authentic), an affidavit

14   attesting to its authenticity must be attached to the submitted document. *Las Vegas*

15   *Sands, LLC v. Neheme*, 632 F.3d 526, 532-33 (9th Cir. 2011). Conclusory statements,

16   speculative opinions, pleading allegations, or other assertions uncorroborated by facts

17   are insufficient to establish the absence or presence of a genuine dispute. *Soremekun v.*

18   *Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

19        The moving party bears the initial burden of demonstrating an absence of a

20   genuine dispute. *Soremekun*, 509 F.3d at 984. "Where the moving party will have the

21   burden of proof on an issue at trial, the movant must affirmatively demonstrate that no

22   reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d

23   at 984. However, if the moving party does not bear the burden of proof at trial, the moving

24   party may meet their initial burden by demonstrating either: (1) there is an absence of

25   evidence to support an essential element of the nonmoving party's claim or claims; or (2)

26   submitting admissible evidence that establishes the record forecloses the possibility of a

27   reasonable jury finding in favor of the nonmoving party. *See Pakootas v. Teck Cominco*

28   *Metals, Ltd.*, 905 F.3d 565, 593-94 (9th Cir. 2018); *Nissan Fire & Marine Ins. Co. v. Fritz*

1    *Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The court views all evidence and any

2    inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v.*

3    *Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014). If the moving party does not meet its

4    burden for summary judgment, the nonmoving party is not required to provide evidentiary

5    materials to oppose the motion, and the court will deny summary judgment. *Celotex*, 477

6    U.S. at 322-23.

7            Where the moving party has met its burden, however, the burden shifts to the

8    nonmoving party to establish that a genuine issue of material fact actually exists.

9    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, (1986). The

10   nonmoving must "go beyond the pleadings" to meet this burden. *Pac. Gulf Shipping Co.*

11   *v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (internal quotation

12   omitted). In other words, the nonmoving party may not simply rely upon the allegations or

13   denials of its pleadings; rather, they must tender evidence of specific facts in the form of

14   affidavits, and/or admissible discovery material in support of its contention that such a

15   dispute exists. *See* Fed. R. Civ. P. 56(c); *Matsushita,* 475 U.S. at 586 n. 11. This burden

16   is "not a light one," and requires the nonmoving party to "show more than the mere

17   existence of a scintilla of evidence." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d

18   376, 387 (9th Cir. 2010)). The non-moving party "must come forth with evidence from

19   which a jury could reasonably render a verdict in the non-moving party's favor." *Pac. Gulf*

20   *Shipping Co.*, 992 F.3d at 898 (quoting *Oracle Corp. Sec. Litig.*, 627 F.3d at 387). Mere

21   assertions and "metaphysical doubt as to the material facts" will not defeat a properly

22   supported and meritorious summary judgment motion. *Matsushita Elec. Indus. Co. v.*

23   *Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

24           When a *pro se* litigant opposes summary judgment, his or her contentions in

25   motions and pleadings may be considered as evidence to meet the non-party's burden to

26   the extent: (1) contents of the document are based on personal knowledge, (2) they set

27   forth facts that would be admissible into evidence, and (3) the litigant attested under

28   penalty of perjury that they were true and correct.  *Jones v. Blanas*, 393 F.3d 918, 923

1   (9th Cir. 2004).

2        Upon the parties meeting their respective burdens for summary judgment, the

3   court determines whether reasonable minds could differ when interpreting the record; the

4   court does not weigh the evidence or determine its truth. *Velazquez v. City of Long Beach*,

5   793 F.3d 1010, 1018 (9th Cir. 2015). The court may consider evidence in the record not

6   cited by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3). Nevertheless,

7   the court will view the cited records before it, and will not mine the record for triable issues

8   of fact. *Oracle Corp. Sec. Litig.*, 627 F.3d at 386 (if a nonmoving party does not make or

9   provide support for a possible objection, the court will likewise not consider it).

10  **III.     DISCUSSION**

11       **A.     First Amendment Retaliation**

12       Defendants first argue that summary judgment should be entered as to First

13  Amendment retaliation claim because Scott failed to exhaust his administrative remedies

14  prior to filing this lawsuit. (ECF No. 43.) Under the Prison Litigation Reform Act ("PLRA"),

15  "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983],

16  or any other Federal law, by a prisoner confined in any jail, prison, or other correctional

17  facility until such administrative remedies as are available are exhausted." 42 U.S.C. §

18  1997e(a). Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). The

19  requirement's underlying premise is to "reduce the quantity and improve the quality of

20  prisoner suits" by affording prison officials the "time and opportunity to address complaints

21  internally before allowing the initiation of a federal case. In some instances, corrective

22  action taken in response to an inmate's grievance might improve prison administration

23  and satisfy the inmate, thereby obviating the need for litigation." *Id.* at 524-25.

24       The PLRA requires "proper exhaustion" of an inmate's claims. *Woodford v. Ngo*,

25  548 U.S. 81, 90 (2006). Proper exhaustion means an inmate must "use all steps the prison

26  holds out, enabling the prison to reach the merits of the issue." *Griffin v. Arpaio*, 557 F.3d

27  1117, 1119 (9th Cir. 2009) (citing *Woodford*, 548 U.S. at 90). Thus, exhaustion "demands

28  compliance with an agency's deadlines and other critical procedural rules because no

1  adjudication system can function effectively without imposing some orderly structure on

2  the course of its proceedings." *Woodford*, 548 U.S. at 90–91.

3       In the Ninth Circuit, a motion for summary judgment will typically be the appropriate

4  vehicle to determine whether an inmate has properly exhausted his or her administrative

5  remedies. *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014). "If undisputed evidence

6  viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant

7  is entitled to summary judgment under Rule 56. If material facts are disputed, summary

8  judgment should be denied, and the district judge rather than a jury should determine the

9  facts." *Id.* at 1166. The question of exhaustion "should be decided, if feasible, before

10  reaching the merits of a prisoner's claim." *Id.* at 1170.

11       Failure to exhaust is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216

12  (2007). The defendant bears the burden of proving that an available administrative

13  remedy was unexhausted by the inmate*. Albino*, 747 F.3d at 1172. If the defendant makes

14  such a showing, the burden shifts to the inmate to "show there is something in his case

15  that made the existing and generally available administrative remedies effectively

16  unavailable to him by 'showing that the local remedies were ineffective, unobtainable,

17  unduly prolonged, inadequate, or obviously futile.'" *Williams v. Paramo*, 775 F.3d 1182,

18  1191 (9th Cir. 2015) (quoting *Albino*, 747 F.3d at 1172).

19                1.    **NDOC's Inmate Grievance System**

20       Administrative Regulation ("AR") 740 governs the grievance process at NDOC

21  institutions. (*See* ECF No. 43-5.) An inmate must grieve through all three levels: (1)

22  Informal; (2) First Level; and (3) Second Level. (*Id.* at 11-16.) The inmate may file an

23  informal grievance within six months "if the issue involves personal property damages or

24  loss, personal injury, medical claims or any other tort claims, including civil rights claims."

25  (*Id.* at 11.) The inmate's failure to submit the informal grievance within this period "shall

26  constitute abandonment of the inmate's grievance at this, and all subsequent levels." (*Id.*

27  at 12.) NDOC staff is required to respond within forty-five days. (*Id.* at 13.)

28       Per AR 740, a grievance at any level may be either, "granted, denied, partially

8

1  granted, abandoned, duplicate, not accepted or grievable, resolved, settled, withdrawn;

2  or referred to the Office of the Inspector General." (*Id.* at 3.) If a grievance is "granted" or

3  resolved by "settlement" at any level, the grievance process is considered complete. (*Id.*

4  at 6.) However, if a grievance is either "partially granted, denied, or resolved" at any level,

5  the inmate must appeal the response to the next level for the grievance process to be

6  deemed "complete" for purposes of exhausting their administrative remedies. (*Id.*)

7       The appeal of an informal grievance is called a "First Level Grievance" and must

8  be filed within 5 days of receiving a response. (*Id.* at 13.) A First Level Grievance should

9  be reviewed, investigated, and responded to by the Warden at the institution where the

10  incident being grieved occurred; however, the Warden may utilize any staff in the

11  development of a grievance response. (*Id.*) The time limit for a response to the inmate is

12  forty-five days. (*Id.* at 14.)

13       Within five days of receiving a First Level response, the inmate may appeal to the

14  Second Level Grievance, which is subject to still-higher review. (*Id.* at 15.) Officials are to

15  respond to a Second Level Grievance within sixty days, specifying the decision and the

16  reasons the decision was reached. (*Id.*) Upon receiving a response to the Second Level

17  Grievance, the inmate will be deemed to have exhausted his administrative remedies and

18  may then file a civil rights complaint in federal court.

19       **2.    Analysis**

20       In this case, Defendants argue Scott failed to properly exhaust his administrative

21  remedies because he did not fully appeal any grievances related to his retaliation claim

22  through all the necessary grievance levels. (ECF No. 43 at 5-6, 8-12.) To support their

23  arguments, Defendants submitted copies of Scott's inmate grievance history, including

24  the grievance that relate to the claims at issue in this case—Grievance No. 2006-31-

25  41087. (*See* ECF No. 43-4 (Scott's Inmate Grievance History).)

26       A careful review of these records supports Defendants' arguments. Although Scott

27  filed a grievance related to Defendants not changing his dressings allegedly in retaliation

28  for filing grievances, the grievance was not properly grieved through all three levels as

1    required by AR 740. Specifically, the grievance was never grieved passed the informal

2    grievance level. (*See* ECF No. 43-4 at 112-113.)

3         It is well established that the PLRA requires "proper exhaustion" of an inmate's

4    claims. *See Woodford*, 548 U.S. at 90. Proper exhaustion means an inmate must "use *all*

5    steps the prison holds out, enabling the prison to reach the merits of the issue." *Griffin*,

6    557 F.3d at 1119 (citing *Woodford*, 548 U.S. at 90) (emphasis added). Additionally,

7    "proper exhaustion demands compliance with an agency's deadlines and other critical

8    procedural rules." *Woodford*, 548 U.S. at 90. Here, it appears Scott failed to follow all

9    required steps to allow prison officials to reach the merits of the issue as he failed to file

10    any grievance past the informal level related to the claims in this case. Accordingly, the

11    Court finds that Scott failed to exhaust his administrative remedies pursuant to NDOC

12    Administrative Regulation 740 prior to initiating this action. As such, Defendants have met

13    their burden to establish that Scott failed to exhaust his administrative remedies with

14    respect to the First Amendment retaliation claim in his case.

15         The burden now shifts to Scott "to come forward with evidence showing that there

16    is something in his particular case that made the existing and generally available

17    administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172 (citing

18    *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)). However, because

19    Scott did not oppose Defendants' motion for summary judgment, he provides no evidence

20    to show that administrative remedies were unavailable to him. Because Scott presents

21    no evidence that administrative remedies were effectively "unavailable," the Court

22    concludes that Scott failed to exhaust available administrative remedies prior to filling this

23    action. Accordingly, the Court recommends that Defendants' motion for summary

24    judgment be granted as to the First Amendment retaliation claim.

25        **B.**    **Eighth Amendment Deliberate Indifference to Serious Medical Needs**

26         Next, Defendants argue Scott's Eighth Amendment deliberate indifference to

27    serious medical needs claim should be dismissed because Defendants are entitled to

28    qualified immunity as Scott cannot establish that any violation occurred and there is no

1   clearly established case that would put Defendants on notice their conduct violated

2   Scott's rights. (ECF No. 43.)

3           The Eighth Amendment "embodies broad and idealistic concepts of dignity,

4   civilized standards, humanity, and decency" by prohibiting the imposition of cruel and

5   unusual punishment by state actors. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal

6   quotation omitted). The Amendment's proscription against the "unnecessary and wanton

7   infliction of pain" encompasses deliberate indifference by state officials to the medical

8   needs of prisoners. *Id.* at 104 (internal quotation omitted). It is thus well established that

9   "deliberate indifference to a prisoner's serious illness or injury states a cause of action

10  under § 1983." *Id.* at 105.

11          Courts in this Circuit employ a two-part test when analyzing deliberate indifference

12  claims. The plaintiff must satisfy "both an objective standard—that the deprivation was

13  serious enough to constitute cruel and unusual punishment—and a subjective standard—

14  deliberate indifference." *Colwell*, 763 F.3d at 1066 (internal quotation omitted). First, the

15  objective component examines whether the plaintiff has a "serious medical need," such

16  that the state's failure to provide treatment could result in further injury or cause

17  unnecessary and wanton infliction of pain. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.

18  2006). Serious medical needs include those "that a reasonable doctor or patient would

19  find important and worthy of comment or treatment; the presence of a medical condition

20  that significantly affects an individual's daily activities; or the existence of chronic and

21  substantial pain." *Colwell*, 763 F.3d at 1066 (internal quotation omitted).

22          Second, the subjective element considers the defendant's state of mind, the extent

23  of care provided, and whether the plaintiff was harmed. "Prison officials are deliberately

24  indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally

25  interfere with medical treatment." *Hallett v. Morgan,* 296 F.3d 732, 744 (9th Cir. 2002)

26  (internal quotation omitted). However, a prison official may only be held liable if he or she

27  "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v.*

28  *Chung*, 391 F.3d 1050, 1057 (9th Cir. 2004). The defendant prison official must therefore

1    have actual knowledge from which he or she can infer that a substantial risk of harm

2    exists, and also make that inference. *Colwell*, 763 F.3d at 1066. An accidental or

3    inadvertent failure to provide adequate care is not enough to impose liability. *Estelle*, 429

4    U.S. at 105–06. Rather, the standard lies "somewhere between the poles of negligence

5    at one end and purpose or knowledge at the other . . . ." *Farmer v. Brennan*, 511 U.S.

6    825, 836 (1994). Accordingly, the defendants' conduct must consist of "more than

7    ordinary lack of due care." *Id.* at 835 (internal quotation omitted).

8          Moreover, the medical care due to prisoners is not limitless. "[S]ociety does not

9    expect that prisoners will have unqualified access to health care…." *Hudson v. McMillian*,

10    503 U.S. 1, 9 (1992). Accordingly, prison officials are not deliberately indifferent simply

11    because they selected or prescribed a course of treatment different than the one the

12    inmate requests or prefers. *Toguchi*, 391 F.3d at 1058. Only where the prison officials'

13    "'chosen course of treatment was medically unacceptable under the circumstances,' and

14    was chosen 'in conscious disregard of an excessive risk to the prisoner's health,'" will the

15    treatment decision be found unconstitutionally infirm. *Id.* (quoting *Jackson v. McIntosh*,

16    90 F.3d 330, 332 (9th Cir. 1996)). In addition, it is only where those infirm treatment

17    decisions result in harm to the plaintiff—though the harm need not be substantial—that

18    Eighth Amendment liability arises. *Jett*, 439 F.3d at 1096.

19          According to the undisputed evidence submitted by Defendants, Scott was

20    transported to Carson Tahoe Hospital ("CTH") approximately twelve times from 2020 to

21    2022, including three overnight hospitalizations. (ECF Nos. 43-2, 43-3, 45-1 (sealed).)

22    Many of the visits related to Scott's fistula in his right upper extremity and subsequent

23    thrombectomy of the fistula. (*See* ECF No. 45-1 (sealed).) Of these visits, two related to

24    possible infections. First, on July 20, 2022, Scott was transported to CTH with a suspected

25    infection and complaints of aches, malaise, and an overall feeling of unwellness. (*Id.* at

26    107.) It was determined Scott did not have an infection at that time. (*Id.* at 128.)

27          On August 8, 2022, a blood culture was taken and returned positive for bacteria.

28    (*Id.* at 198-199.) On August 9, 2022, Scott was transported to CTH, where it was

1    determined he had "symptomatic line-associated bacteremia," which turned out to be

2    Enterobacter. (*Id.* at 133-134, 156, 183-184.) Consultation notes from August 10, 2022

3    and August 12, 2022, state that Scott has had "multiple rounds on (sic) infections and

4    claims its (sic) due to unsanitary conditions at prison and not being given enough supplies

5    to protect the cathter (sic) from sweat/shower." (*Id.* at 145, 172.) To treat the infection,

6    Scott's tunneled hemodialysis catheter was removed. (*Id.* at 160.) A discharge note also

7    indicated that Scott "expressed concern over frequent infections due to inability to keep

8    port area clean." (*Id.* at 175.)  Scott was ultimately discharged from CTH on August 12,

9    2022. (*Id.*)

10         Additionally, according to a declaration submitted by Kristen McGee, the Facility

11    Manager for NaphCare at NNCC, despite instructions to not change or adjust his own

12    dressing, Scott would occasionally present for his dialysis treatment with a different

13    dressing, or a dressing which had obviously been tampered with. (ECF No. 43-1 at 4.)

14    When asked by dialysis staff why the dressing was different or tampered with, Scott would

15    refuse to tell them. (*Id.*)

16         As to the objective element of deliberate indifference, it appears to be undisputed

17    that treatment of Scott's blood infection constitutes a serious medical need. Thus, the

18    Court finds that the objective element of deliberate indifference has been satisfied.

19    However, Defendants argue summary judgment should be granted because Scott cannot

20    establish the second, subjective element of his claim. Specifically, Defendants argue they

21    were not deliberately indifferent to Scott's medical condition. Under the subjective

22    element, there must be some evidence to create an issue of fact as to whether the prison

23    official being sued knew of, and deliberately disregarded the risk to Scott's safety. *Farmer*,

24    511 U.S. at 837. "Mere negligence is not sufficient to establish liability." *Frost v. Agnos*,

25    152 F.3d 1124, 1128 (9th Cir. 1998). Moreover, this requires Scott to "demonstrate that

26    the defendants' actions were both an actual and proximate cause of [his] injuries." *Lemire*

27    *v. California*, 726 F.3d 1062, 1074 (9th Cir. 2013) (citing *Conn v. City of Reno*, 591 F.3d

28    1081, 1098- 1101 (9th Cir. 2010), *vacated by City of Reno, Nev. v. Conn*, 563 U.S. 915

1    (2011), *reinstated in relevant part* 658 F.3d 897 (9th Cir. 2011).

2        Here, as detailed above, Defendants submitted authenticated and undisputed

3    evidence which affirmatively shows Scott received adequate care while incarcerated

4    related to his blood infection. (*See* ECF Nos. 45-1, 45-2, 45-3, 45-4 (sealed).) Evidence

5    shows that Scott received continuous monitoring related to his hemodialysis and received

6    immediate elevated care—i.e., transport to CTH—for suspected infections. (*See id.*)

7    While Scott did have an infection, there is no indication that Defendants were aware of

8    the infection and then failed to treat it. Instead, the evidence shows that once an infection

9    was detected on August 8, 2022, Scott was immediately taken to CTH and received

10   several days of hospital treatment. (*See* ECF No. 45-1 at 133-175 (sealed).)

11       Further, to the extent Scott alleges he was forced to change his own dressings,

12   which resulted in the infection, there is no evidence in the record to support his assertion.

13   Instead, it appears it would be against the standard of care to allow inmates to change

14   their own dressings and on several occasions, Scott appeared for appointments with

15   obviously altered dressings but no explanation as to the alteration. (*See* ECF No. 43-1.)

16   Additionally, there is no record of nurses or any prison staff providing Scott with the

17   medical supplies necessary to change his own dressings. In fact, Scott's own grievance

18   contradicts his assertions that he was given his own supplies and told to change his own

19   dressings. In Grievance No. 2006-31-41087, Scott specifically states that he informed

20   custodial staff that he needed to change his perma-catheter dressings because it was too

21   wet from sweat and he did not have the appropriate supplies to change his own dressing.

22   (ECF No. 43-4 at 112.) Scott then states a cell search confirmed he did not have any

23   supplies. (*Id.*) Finally, Scott states he was "ordered to go to the infirmary for the dressing

24   change." (*Id.*)

25       Based on the above, Defendants have met their initial burden on summary

26   judgment by showing the absence of a genuine issue of material fact as to the deliberate

27   indifference claims related to treatment of infections. *See Celotex Corp.*, 477 U.S. at 325.

28   The burden now shifts to Scott to produce evidence that demonstrates an issue of fact

exists as to whether Defendants were deliberately indifferent to his medical needs. *Nissan*, 210 F.3d at 1102.

Aside from his own assertions in his complaint, Scott provides no further evidence or support that a denial or delay in treatment caused him any damage. He has not come forward with evidence to show Defendants knew of an excessive risk to his health and disregarded that risk. To the contrary, the evidence before the Court shows Scott's concerns about his hemodialysis treatment and any treatment related thereto were affirmatively treated and there is no evidence showing that he suffered any damage. Therefore, Scott has failed to meet his burden on summary judgment to establish that prison officials were deliberately indifferent to his medical needs, as he failed to come forward with any evidence to create an issue of fact as to whether Defendants deliberately denied, delayed, or intentionally interfered with treatment. *See Hallett*, 296 F.3d at 744.

As Defendants met their burden on summary judgment, and Scott has not established that a genuine issue of material fact exists, Defendants' motion for summary judgment should be granted.[4] *Matsushita,* 475 U.S. at 586.

## IV.    CONCLUSION

For the reasons stated above, the Court recommends that Defendants' motion for summary judgment, (ECF No. 43), be granted.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the

---

[4]    Because the Court finds that Scott's claim fails on the merits, it need not address Defendants' other procedural arguments.

1   District Court's judgment.

2   **V.    RECOMMENDATION**

3        **IT IS THEREFORE RECOMMENDED** that Defendants' motion for summary

4   judgment, (ECF No. 43), be **GRANTED**.

5        **IT IS FURTHER RECOMMENDED** that the Clerk **ENTER JUDGMENT** accordingly

6   and **CLOSE** this case.

7        **DATED**: May 14, 2025

8        _____

9        **UNITED STATES MAGISTRATE JUDGE**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28